IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD LIEBERMAN, | : | CIVIL ACTION |
| | : | NO. 14-3393 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CORPORACION EXPERIENCA | : | |
| UNICA, S.A., et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| RICHARD KREIBICH, et al., | : | CIVIL ACTION |
| | : | NO. 14-5102 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PLAYA DULCE VIDA, S.A., et al., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    December 27, 2016

I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY................. 2
II.  MOTION FOR JUDGMENT ON THE PLEADINGS..................... 7
III. MOTION FOR SUMMARY JUDGMENT............................. 11
     A.   Breach of Contract................................. 13
          1.   Timeliness.................................... 14
          2.   Merits........................................ 18
     B.   Piercing the Corporate Veil........................ 30
     C.   Fraud.............................................. 39

    D.    Tortious Interference............................... 41

IV.  MOTION TO APPOINT RECEIVER............................... 44

V.   CONCLUSION............................................. 48

These two cases – consolidated for pretrial purposes – involve several investments in a resort located in Costa Rica. Following discovery, the parties have filed a number of motions. For the reasons that follow, the Court will: (1) deny the Motion for Judgment on the Pleadings; (2) grant in part the Motion for Summary Judgment; and (3) deny the Motion to Appoint a Receiver.

**I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Playa Dulce Vida, S.A. ("PDV") is a corporation organized and existing under the laws of Costa Rica. David Callan Decl. ¶ 2, <u>Kreibich</u> ECF No. 33-1.[1] PDV owns and operates the Arenas Del Mar Beachfront and Rainforest Resort ("the Resort") in Costa Rica. <u>Id.</u> ¶ 5.

In 2004, Plaintiff Richard Lieberman became aware of the opportunity to invest in PDV by purchasing a condo-apartment, or unit, at the Resort. Another investor, Glenn Jampol, introduced Lieberman to Gary Haynes,[2] a real estate agent who served as PDV's representative for the sale of units at the

---

[1]    The Court consolidated these cases for pretrial purposes. Defendants then filed a single motion for summary judgment, addressing both cases, in <u>Kreibich</u>. Citations to either docket are marked accordingly.

[2]    Jampol and Haynes are not parties here.

Hotel. Second Am. Compl. ¶¶ 60-63, Lieberman ECF No. 19. Haynes informed Lieberman that PDV was not actually selling real estate, but instead was selling "preferred shares" of stock in PDV. These shares would vest a purchaser/shareholder with proprietary rights to "the full use and enjoyment" of a designated unit at the Resort – in other words, it was a timeshare agreement of sorts. Id. ¶¶ 67-68. Haynes also said that shareholders would earn income from their shares, because when a unit was not in use by its shareholder owner, it would be rented to the public by the Resort. Id. ¶ 69.

Thereafter, in November 2004, Lieberman bought twenty-five preferred shares, representing unit 603 ("the Lieberman Unit") at the Resort. Id. ¶¶ 65, 79-80. His purchase was memorialized by three stock certificates (collectively, "the Stock Certificates"). Id. ¶ 81. In the course of his purchase of shares, Lieberman signed a set of documents: a Reciprocal Promise of Purchase and Sale ("the PSA"), a Rental Pool Agreement ("the RPA"), the Regulations, and a Purchase/Sale Contract for Shares ("the PSCFS") (collectively, "the Contract"). See Defs.' Mot. Summ. J. Ex. D, Kreibich ECF No. 33-4.

The following year, Plaintiffs Richard Kreibich and Susan Kreibich ("the Kreibichs") also learned about the opportunity to invest in the Resort. Specifically, they were

introduced to Defendant David Callan, who informed the Kreibichs that he was a licensed financial advisor, an officer of PDV, a member of the PDV Board, and a member of the PDV Executive Committee. First Am. Compl. ¶¶ 54-60, Kreibich ECF No. 9. Callan explained that purchasing preferred shares would give the Kreibichs usage rights to a particular unit, as well as income from their unit's placement in the Resort rental pool. Id. ¶¶ 62-65.

As a result, in February 2006, the Kreibichs purchased fifteen preferred shares, representing unit 501 ("the Kreibich Unit") at the Resort. Id. ¶¶ 80, 90-95. The Kreibichs, like Lieberman, signed the Contract with PDV.

In February 2011, several years after the Resort opened, the PDV board of directors issued a letter to the preferred shareholders ("the Preferred Shareholders Letter" or "the Letter"). Second Am. Compl. Ex. J, Lieberman ECF No. 19-3. The Letter explained that in order for the Resort to be a financial success, the company was undergoing an "important ownership restructuring." Id. at 1. As part of the restructuring, the company offered to preferred shareholders the option to convert their preferred shares – that is, their contractual rights to their respective units at the Resort – to common stock. Id. at 3. The Letter explained that preferred shareholders who exercised that option would "continue to

4

receive usage rights[,] but as common shareholders." Id. The
usage rights for common shareholders were set forth in the
Letter, id. at 5, and, as the Letter noted, could "be modified
by the Board of Directors," id. at 3. Thus, the Letter cautioned
preferred shareholders that "if usage is a critical reason for
ownership, then one needs to weigh the cost/benefit analysis of
giving up that usage right." Id. The Kreibichs opted to convert
their preferred shares into common shares. Kreibich First Am.
Compl. ¶ 140. Lieberman did not. Lieberman Second Am. Compl.
¶ 128.

Neither Lieberman nor the Kreibichs have received any
income distributions from their respective investments in the
Resort. Id. ¶ 117; Pls.' Mem. Law Opp'n at 5, Kreibich ECF No.
35. They also contend that Defendants have, in violation of the
Contract, failed to provide audited financial statements for
certain fiscal years. Lieberman Second Am. Compl. ¶¶ 110-12;
Kreibich First Am. Compl. ¶¶ 110-14. Moreover, Lieberman claims
that Defendants have breached the Contract by declining to
accept or honor his attempts to reserve his Unit at particular
times. Lieberman Second Am. Compl. ¶¶ 144-200.

Lieberman filed a Complaint against PDV, Hawk
Management L.P. ("Hawk Management"), and HWC, LLC ("HWC"), on

June 10, 2014.[3] Lieberman ECF No. 1. He later filed a First

Amended Complaint, Lieberman ECF No. 8 – which added Hawk

Opportunity Fund, L.P. ("HOF") as a defendant – and a Second

Amended Complaint,[4] Lieberman ECF No. 19, which was dismissed in

part, Lieberman ECF No. 31. The following claims remain in that

case: (1) alter ego liability/piercing the corporate veil; (2)

breach of contract; (3) conversion; (4) tortious interference

with contract; (5) private nuisance; and (6) promissory

estoppel.

The Kreibichs filed a Complaint against PDV, HOF, Hawk

Management, HWC, and David Callan on September 5, 2014. Kreibich

ECF No. 1. They later filed a First Amended Complaint, Kreibich

ECF No. 9, which was dismissed in part, Kreibich ECF No. 18. The

following claims remain in that case: (1) alter ego

liability/piercing the corporate veil; (2) breach of contract;

(3) fraud/misrepresentation; (4) tortious interference with

contract; and (5) fraud in the inducement.

The Court consolidated these two cases for pretrial

---

[3]     The first complaint also named as a defendant
Corporacion Experienca Unica, S.A., which was not named as a
defendant in the amended complaints.

[4]     The Second Amended Complaint added David Callan as a
defendant.

purposes.[5] <u>Kreibich</u> ECF No. 18. After discovery, several motions are now ripe for disposition: (1) a Motion to Appoint Receiver, filed by Lieberman and the Kreibichs, <u>Lieberman</u> ECF No. 45;[6] (2) a Motion for Judgment on the Pleadings, filed by Defendants, <u>Lieberman</u> ECF No. 57;[7] and (3) a Motion for Summary Judgment, filed by Defendants, <u>Kreibich</u> ECF No. 32.[8]

## II.  MOTION FOR JUDGMENT ON THE PLEADINGS

Though Defendants' motion for judgment on the pleadings was filed after their motion for summary judgment, the Court must address it first because it challenges the Court's subject matter jurisdiction.

Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed – but early enough not to

---

[5]      Both cases were filed as actions in diversity. <u>Lieberman</u> Second Am. Compl. ¶ 23; <u>Kreibich</u> First Am. Compl. ¶ 21. Defendants challenged the Court's personal jurisdiction over PDV at the motion to dismiss stage, <u>Kreibich</u> ECF No. 11, but – with one exception, as discussed below – have not raised jurisdictional issues since then.

[6]      Plaintiffs also filed, with respect to this motion, a motion for leave to file a reply brief, <u>Lieberman</u> No. 49, which the Court will grant.

[7]      Defendants also filed, with respect to this motion, a motion for leave to file a reply brief, <u>Lieberman</u> ECF No. 60, which the Court will grant.

[8]      Defendants also filed, with respect to this motion, a motion for leave to file a reply brief, <u>Kreibich</u> ECF No. 37, which the Court will grant. Plaintiffs then filed motions for leave to file sur-replies, <u>Kreibich</u> ECF Nos. 38, 39, which the Court will also grant.

delay trial – a party may move for judgment on the pleadings."[9]
Judgment on the pleadings is appropriate only if the moving
party "clearly establishes that no material issue of fact
remains to be resolved and that he is entitled to judgment as a
matter of law." Society Hill Civic Ass'n v. Harris, 632 F.2d
1045, 1054 (3d Cir. 1980) (citation omitted). In reviewing a
Rule 12(c) motion, a court "must view the facts presented in the
pleadings and the inferences to be drawn therefrom in the light
most favorable to the nonmoving party." Rosenau v. Unifund
Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Jablonski v.
Pan Am. World Airways, Inc., 863 F.2d 289, 290-91 (3d Cir.
1988)).

    In their motion for judgment on the pleadings,
Defendants argue that the Court lacks subject matter
jurisdiction over this case because Plaintiffs lack standing to
bring it. Specifically, Defendants believe that Plaintiffs'
claims are derivative, not direct, and thus that they cannot be
brought in Plaintiffs' personal capacities.

    In Pennsylvania, a shareholder lacks standing "to

---

[9]     Though this motion for judgment on the pleadings comes
unusually late in the litigation, no trial date has yet been
scheduled in this case, and thus the trial has not been delayed
by the filing of this motion. Moreover, "[c]hallenges to
subject-matter jurisdiction can of course be raised at any time
prior to final judgment." Grupo Dataflux v. Atlas Global Grp.,
L.P., 541 U.S. 567, 571 (2004).

institute a direct suit for 'a harm [that is] peculiar to the
corporation and [that is] only [] indirectly injurious to [the]
shareholder.'" Hill v. Ofalt, 85 A.3d 540, 548 (Pa. Super. Ct.
2014) (alterations in original) (quoting Reifsnyder v.
Pittsburgh Outdoor Advertising Co., 173 A.2d 319, 321 (1961)).
Instead, "such a claim belongs to, and is an asset of, the
corporation." Id. This type of claim – one belonging to the
corporation, rather than the shareholder – is called a
derivative claim.

          In order to have standing to bring a direct suit –
that is, to sue individually, rather than on behalf of the
corporation – a shareholder "must allege a direct, personal
injury – that is independent of any injury to the corporation –
and the shareholder must be entitled to receive the benefit of
any recovery." Id. "If the injury is one to the plaintiff as a
stockholder and to him individually, and not to the corporation,
it is an individual action." Fishkin v. Hi-Acres, Inc., 341 A.2d
95, 98 n.4 (Pa. 1975) (quoting 13 Fletcher Cyclopedia
Corporations § 5911 (Perm. Ed.)).

          Accordingly, a court facing the question of whether an
action is direct or derivative must approach the inquiry as
follows:

          . . . Whether  a  cause  of  action  is  individual  or
          derivative must be determined from the nature of the
          wrong  alleged  and  the  relief,  if  any,  that  could

9

result if the plaintiff were to prevail.

> In determining the nature of the wrong alleged, the court must look to the body of the complaint, not to the plaintiff's designation or stated intention. The action is derivative if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent dissipation of its assets . . . . If damages to a shareholder result indirectly, as the result of any injury to the corporation, and not directly, the shareholder cannot sue as an individual.

Hill, 85 A.3d at 549 (quoting 12B Fletcher Cyclopedia of the Law of Corporations § 5911 (2013). "If the court determines that a claim is actually derivative in nature, the plaintiff is precluded from proceeding directly." Resh v. Bortner, No. 16-02437, 2016 WL 6834104, at *5 (E.D. Pa. Nov. 21, 2016).

Looking to the bodies of Plaintiffs' complaints, as well as the relief they seek, it is evident that Plaintiffs allege direct, rather than derivative, claims.

First, Plaintiffs are not alleging any injury to PDV. In many derivative suits, for example, shareholders argue that they have been injured by the devaluing of their investments due to poor decisions that have harmed the corporation – that is, that others have injured the corporation and the shareholders have suffered as a result. See Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir. 1970) ("A stockholder of a corporation does not acquire standing to maintain an action in

10

his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets."); <u>Resh</u>, 2016 WL 6834104, at *6. Here, in contrast, the injuries alleged by Plaintiffs were inflicted directly on the shareholders, by the corporation. Indeed, Plaintiffs could not even conceivably bring these claims on behalf of PDV because they implicitly claim that PDV <u>benefited from</u> – and was not harmed by – the actions at issue. In short, then, Plaintiffs' claims are "independent of any injury to the corporation." <u>Hill</u>, 85 A.3d at 548.

Second, Plaintiffs would be "entitled to receive the benefit of any recovery." <u>Id.</u> The requested recovery would not go to PDV, where it would trickle down to Plaintiffs in the form of increased stock value, but instead would go directly to Plaintiffs.

Therefore, Plaintiffs' claims are direct, rather than derivative, and Plaintiffs have standing to pursue them.

## III. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion

11

for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). In short, the essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

Defendants move to dismiss some, but not all, of the claims in these two cases.[10] Each of Defendants' arguments is analyzed in turn below.

A.   <u>Breach of Contract</u>

Both Lieberman and the Kreibichs bring breach of contract claims. Lieberman contends that Defendants breached the Contract by: (1) failing to provide audited financial statements for fiscal years 2004 to 2006 and 2011 until at least 2014, <u>Lieberman</u> Second Am. Compl. ¶¶ 221-23; (2) using improper accounting methodologies to arrive at a net income that allows Defendants to avoid paying income distributions to Lieberman, <u>id.</u> ¶¶ 224-28; and (3) "unilaterally and secretly modifying the terms of" the Contract in order to refuse Lieberman access to his Unit, <u>id.</u> ¶¶ 230-31. The Kreibichs contend that Defendants breached the Contract by: (1) failing to provide audited financial statements for fiscal years 2011, 2012, and 2013, <u>Kreibich</u> First Am. Compl. ¶¶ 170-71; and (2) using improper accounting methodologies to arrive at a net income that allows Defendants to avoid paying income distributions to the Kreibichs, <u>id.</u> ¶¶ 172-75.

---

[10]      Specifically, Defendants do not move for summary judgment on Lieberman's claims of conversion, private nuisance, or promissory estoppel. They also do not move for summary judgment as to portions of Plaintiffs' breach of contract claims.

Defendants move for summary judgment on only a portion of these breach of contract claims: the claim that Defendants breached the Contract by manipulating PDV's accounting in such a way that allowed PDV to avoid paying distributions to its preferred shareholders, including Lieberman and the Kreibichs. Defendants argue that this claim is (1) barred by the statute of limitations, and (2) foreclosed by the language of the Contract.

1.   Timeliness

First, Defendants argue that this breach of contract claim is untimely.

The parties agree that Pennsylvania's four-year statute of limitations applies to this claim.[11] See 42 Pa. Const. Stat. Ann. § 5525(a). But they appear to disagree about when the claim accrued, such that the statute of limitations began to run. See Gleason v. Borough of Moosic, 15 A.3d 479, 484 (Pa. 2011) ("Generally, a statute of limitations period begins to run when a cause of action accrues; i.e., when an injury is inflicted and the corresponding right to institute a suit for damages arises.").

Curiously, Defendants do not actually state a specific

---

[11]     "[A] federal court must apply the substantive laws of its forum state in diversity actions, and these include state statutes of limitations." Stephens v. Clash, 796 F.3d 281, 289 (3d Cir. 2015) (alteration in original) (quoting Lafferty v. St. Riel, 495 F.3d 72, 76 (3d Cir. 2007)).

date on which they believe this claim accrued. They suggest that
it may have accrued sometime in 2008, because "there is no
question that Plaintiffs[] were aware that PDV had financial
issues in 2008" but "did nothing for seven years until filing
these actions." Defs.' Mem. Law at 13, <u>Kreibich</u> ECF No. 32. But
this is not a coherent argument concerning the accrual of the
breach of contract claim; the claim is not about PDV's
"financial issues" generally, but PDV's specific failure to pay
distributions from the rental pool. To that end, Defendants do
state that distributions, if any, should have been paid on
November 29, 2008; November 29, 2009; and November 29, 2010.
<u>Id.</u>[12] Again, though, they do not explain how any or all of these
dates impact the statute of limitations – an important omission,
because those dates have different implications.

Most obviously, any claim for distributions that
should have been paid on November 29, 2010, is not time-barred,
because Plaintiffs filed their claims on June 10, 2014
(Lieberman), and September 5, 2014 (the Kreibichs) – within the
four-year limitations period, which did not expire until
November 2014.

---

[12]     They also mention November 29, 2005; November 29,
2006; and November 29, 2007, Defs.' Mem. Law at 13, but those
dates are irrelevant because "Plaintiffs are not seeking rental
pool distributions for" those fiscal years. Pls.' Mem. Law at 17
n.6, <u>Kreibich</u> ECF No. 35.

As to the 2008 and 2009 non-distributions, Plaintiffs invoke Pennsylvania's discovery rule to argue that those claims did not accrue until February 15, 2011, when Defendants produced audited financial statements and Plaintiffs discovered their alleged rights to distributions for previous years. Pls.' Mem. Law at 18. In other words, their argument is that they had no way to know, until they received the financial statements, that they were entitled to, and should have been receiving, income distributions.

The discovery rule "tolls the accrual of the statute of limitations when a plaintiff is unable, 'despite the exercise of due diligence, to know of the injury or its cause.'" Mest v. Cabot Corp., 449 F.3d 502, 510 (3d Cir. 2006) (quoting Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983)); see also City of Philadelphia v. One Reading Ctr. Assocs., 143 F. Supp. 2d 508, 526 (E.D. Pa. 2001) ("The discovery rule is based on the notion that it would be unjust to deprive a party of a cause of action before that party has a reasonable basis for concluding that a viable claim exists."). The rule "focuses not on 'the plaintiff's actual knowledge, but rather on whether the knowledge was known, or through the exercise of diligence, knowable to' the plaintiff." Mest, 449 F.3d at 510 (quoting Bohus v. Beloff, 950 F.2d 919, 925 (3d Cir. 1991)). In order to demonstrate that he exercised such

16

"reasonable diligence," a plaintiff must show "that he pursued the cause of his injury with those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." Id. (quoting Cochran v. GAF Corp., 666 A.2d 245, 249 (Pa. 1995)).

"[W]hether a plaintiff has exercised reasonable diligence is generally a factual question reserved for the jury," id. at 512, because of "the fact intensive nature of the inquiry," Gleason, 15 A.3d at 363. Only if "the facts are so clear that reasonable minds could not differ" may a court determine that, as a matter of law, a party was not reasonably diligent. Id.; see also Mest, 449 F.3d at 512. Here, then, the question is whether the facts are so clear that reasonable minds could not determine that Plaintiffs were reasonably diligent in discovering their alleged injuries.

On the record before the Court at this time, the facts are not so clear, as potentially relevant questions remain unanswered. For example, though Plaintiffs have admitted that they did not contact PDV after they did not receive rental pool distributions for the fiscal years at issue, Pls.' Interrog. Resps. ¶¶ 22-27, Defs.' Mot. Summ. J. Ex. G, ECF Nos. 33-7, 33-8, the record appears to be silent as to whether Plaintiffs actually had reason to expect rental pool distributions those

17

years. If they did not – or, especially, if they had reason <u>not</u> to expect distributions – reasonable minds could conclude that failing to contact PDV about that issue does not evidence a lack of diligence. Accordingly, the Court will decline to remove this question from the jury's purview by granting judgment at this time.

To summarize, Plaintiffs' claims concerning distributions that should have been paid on November 29, 2010, are not time-barred, and factual questions remain concerning distributions that should have been paid in 2008 and 2009. Accordingly, the Court will deny the motion for summary judgment as to the timeliness of Plaintiffs' breach of contract claims.

### 2.   <u>Merits</u>

Defendants also argue that they are entitled, as a matter of law, to judgment on Plaintiffs' claims that Defendants breached the Contract by using improper accounting methodologies and, as a result, failing to pay rental pool income distributions.

The Rental Pool Agreement, or RPA, provides that preferred shareholders "shall receive 60% of the net income generated from the rental income of the apartments combined, regardless of the occupancy rate of each individually." Rental

Pool Agreement at 5,[13] Defs.' Mot. Summ. J. Ex. D, <u>Kreibich</u> ECF No. 33-4 [hereinafter Contract]. The RPA then defines "net income" as:

> the sum total income calculated after the deduction of credit charges, insurance policies, institutional deductions, commissions to travel agents and tour operators, costs of discounts as a result of exchanges, municipal and other (government) taxes, as well as the cost to maintain and operate the rented facilities, including operating personnel, maintenance in general, gardeners, service of maids, electric power, water and telephone, security and repairs, whose costs shall be deducted from the income to be distributed.

<u>Id.</u>

The dispute here is whether this definition permits Defendants to deduct "debt service, depreciation[,] and capital expenditures" from PDV's calculation of net income.[14] <u>Lieberman</u> Second Am. Compl. ¶ 225. According to Plaintiffs, Defendants' deduction of expenses in these categories has resulted in a nearly $9 million difference between the parties' calculations. Defendants say that they may include these deductions, and have

---

[13]     Cited page numbers for any portion of the Contract refer to the page numbers imposed by ECF.

[14]     For these purposes, at least, Defendants appear to accept Plaintiffs' definitions of these terms. Defs.' Mem. Law at 8 n.6. Plaintiffs define "debt service" as "the payment of interest on borrowed money"; "depreciation expense" as "a non-cash accounting method of allocating the cost of a tangible asset over its useful life"; and "capital costs" as "the payment of money to acquire, construct or improve fixed, tangible assets including but not limited to land, buildings, construction and equipment." Pls.' Interrog. Resps. ¶¶ 15-17.

arrived at net <u>losses</u> for most fiscal years from 2008 to 2014 –
nearly $500,000 total. Pls.' Mem. Law at 9. If correct, those
losses mean that Plaintiffs are not entitled, under the RPA, to
rental pool income distributions for those years. On the flip
side, Plaintiffs do not include deductions for those categories
of expenses, and they calculate that PDV has a cumulative
positive net <u>income</u> of more than $8 million for fiscal years
2008 to 2014. <u>Id.</u> at 9-10. If correct, Plaintiffs' calculations
mean that Plaintiffs are theoretically entitled to rental pool
distributions from that income (provided, of course, that they
otherwise qualify for distributions under the terms of the
contract[15]). Accordingly, this case presents a question of
contract interpretation: does the Contract allow Defendants to
deduct these particular categories of expenses from its
calculation of net income?

A federal court sitting in diversity must apply the
substantive law as decided by the highest court of the state
whose law governs the action. <u>Erie R.R. Co. v. Tompkins</u>, 304
U.S. 64, 78 (1938); <u>Orson, Inc. v. Miramax Film Corp.</u>, 79 F.3d
1358, 1373 n.15 (3d Cir. 1996). Here, the parties agree that
Pennsylvania contract law controls. <u>See</u> Defs.' Mem. Law at 7

---

[15]     For example, the Kreibichs converted their preferred
shares to common shares at some point and thus are presumably
ineligible for rental pool distributions originating after that
conversion took effect (a date which is in dispute).

(citing Pennsylvania contract law); Pls.' Mem. Law at 13 (citing Pennsylvania contract law).

In American Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575 (3d Cir. 2009), the Third Circuit, applying Pennsylvania law, prescribed the methodology that a court should use when interpreting a contract. "[A]s a preliminary matter, courts must determine as a matter of law which category written contract terms fall into – clear or ambiguous." Id. at 587 (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995)). If the contract is clear, it should be interpreted by the court as a matter of law. Id. (citing Gonzalez v. U.S. Steel Corp., 398 A.2d 1378, 1385 (1979); Allegheny Int'l v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994)). If it is ambiguous, "deciding the intent of the parties becomes a question of fact for a jury." Id. (citing Cmty. Coll. of Beaver Cty. v. Cmty. Coll. of Beaver Cty., Soc'y of the Faculty, 375 A.2d 1267, 1275 (1977)).

When interpreting a contract, the court begins with the "firmly settled" principle that "the intent of the parties to a written contract is contained in the writing itself." Id. (quoting Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)). Where the words of a contract are clear and unambiguous, its meaning must be determined by its contents

21

alone, without reference to extrinsic aids or evidence. Id.

(quoting Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982)).

On the other hand, "a contract is ambiguous, and thus

presents a question of interpretation for a jury, if the

contract 'is reasonably susceptible of different constructions

and capable of being understood in more than one sense.'" Id.

(quoting Allegheny Int'l, 40 F.3d at 1425). Under such

circumstances, a court "may look 'outside the four corners of

the contract'" and "receive extrinsic evidence . . . to resolve

the ambiguity." Id. at 588 (quoting Duquesne Light Co., 66 F.3d

at 614).

In summary,

> [a] contract is ambiguous if it is
> reasonably susceptible of different constructions and
> capable of being understood in more than one sense.
> The court, as a matter of law, determines the
> existence of an ambiguity and interprets the contract
> whereas the resolution of conflicting parol evidence
> relevant to what the parties intended by the ambiguous
> provision is for the trier of fact.

In re Old Summit Mfg., LLC, 523 F.3d 134, 137 (3d Cir. 2008)

(quoting Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa.

1986)). The first question, then, is whether the Contract in

this case is clear or ambiguous concerning the scope of the

deductions permitted in PDV's calculation of "net income."

Defendants do not argue that the expense categories at

issue actually fall into any of the categories explicitly

articulated in the RPA's definition of net income. Certainly, at least, they do not point to any particular portion of the definition. As a result, Defendants arguably concede that the deductions at issue do not appear in the plain words of the Contract. To cure this problem, they argue that their own reading of the RPA is "the only sensible and reasonable interpretation" of the contract because Plaintiffs' interpretation would essentially require PDV to "default on its mortgage and divert the funds properly due under the loan to the Rental Pool for the preferred shareholders' benefit." Defs.' Reply at 4-5, Kreibich ECF No. 37-1. If PDV was forced to follow this path, Defendants say, "the lender would foreclose on the Resort, and all shareholders, Plaintiffs included, would be in peril of completely losing their investment." Id.

It is true that, where "the plain meaning of a contract term would lead to an interpretation that is absurd and unreasonable, Pennsylvania contract law allows a court to construe the contract otherwise in order to reach 'the only sensible and reasonable interpretation' of the contract." Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 98 (3d Cir. 2001) (quoting United Refining Co. v. Jenkins, 189 A.2d 574, 580 (Pa. 1963)). But in order to do that here, the Court would need to assume or accept that complying with Plaintiffs' interpretation of the RPA would cause PDV to default on its

mortgage, as Defendants have not advanced any other reasons that Plaintiffs' interpretation would be absurd. The Court is obviously not in a position, at the summary judgment stage, to draw factual conclusions about the financial implications of a theoretical result. Rather, if Defendants believe that Plaintiffs' interpretation of the Contract would necessarily lead to the financial collapse of PDV, they must present relevant evidence to a trier of fact.

Defendants also argue that when the Contract is read in its entirety,[16] the deductions at issue are clearly permitted. They point to five excerpts from other portions of the Contract:

- Article 9(a) of the Regulations requires preferred shareholders to "cover the expenses of management, preservation and operation of common areas, services and assets in the amount corresponding to the preferred shares in accordance with the Rental Pool Agreement and all other agreements herewith attached and subscribed to for the [sic] purpose." Contract at 8.

- Article 9(b) of the Regulations obligates preferred shareholders to "cover, in proportion to their number of shares, the expenses incurred for expansion, reconstruction or improvement of common areas, or for acquisition of assets and common equipment when authorized in accordance by [sic] the By-Laws or a resolution adopted by a majority vote of the preferred shareholders." Id. at 9.

---

[16]     See Commonwealth ex rel. Kane v. UPMC, 129 A.3d 441, 463-64 (Pa. 2015) ("[T]he entire contract should be read as a whole . . . to give effect to its true purpose." (ellipsis in original) (quoting Pritchard v. Wick, 178 A.2d 725, 727 (1962))).

- Article 10(b) of the Regulations requires preferred shareholders to "pay any admission, special and/or maintenance fees established by the Board of Directors." Id. at 9.

- Article 13 of the Regulations states that, for the purposes of Article 10, "common expenses" include "[l]ocal taxes and municipal charges which may affect the company, the ownership of the [Resort] and any other compulsory charge"; and expenses "incurred for maintenance and preservation of services, real property and common equipment." Id. at 10.

- Section F of the PSCFS, entitled "Insurance & All General Expenses," provides that the Resort's insurance policy, "like all operating expenses as described herein these contracts and Annexes herewith attached, are and will be paid annually through the income of the rental pool, and if those funds are not sufficient from the 'pool' to cover said policy and expenses, then the Shareholder/Condo Apartment Owner will be billed their proportional amount according to their total ownership of preferred shares." Id. at 14.

For the most part, these excerpts do not, as Defendants claim, create indisputable clarity concerning the Contract. Indeed, in some ways, they increase the amount of ambiguity here. Each excerpt is taken in turn below.

First, one plausible reading of Article 9(a) might suggest that one or more of the disputed categories are covered by the Contract. Specifically, a broad reading of "the expenses of management, preservation and operation of common areas, services and assets" could encompass, at least, debt service (that is, mortgage payments) and depreciation costs, both of which might fall under the preservation of assets, if nothing else. But Article 9(a) immediately confuses the situation by

25

stating that those expenses must be covered "in accordance with the Rental Pool Agreement." Therefore, a different reading of Article 9(a) plausibly suggests that the expenses summarized in the article are those already delineated in the Rental Pool Agreement, rather than additional – and much broader – types of expenses. And as discussed above, Defendant seems to concede that the language of the Rental Pool Agreement does not itself encompass the categories at issue. Accordingly, Article 9(a) does not clearly state that PDV can, in effect, charge the preferred shareholders for the disputed categories of expenses by deducting the expenses from the rental pool income.

Article 9(b) does clearly appear to cover the disputed category of capital costs, which Plaintiffs define as "the payment of money to acquire, construct or improve fixed, tangible assets including but not limited to land, buildings, construction and equipment." Pls.' Interrog. Resps. ¶ 17. This language is similar to Article 9(b), which requires preferred shareholders to cover "the expenses incurred for expansion, reconstruction or improvement of common areas, or for acquisition of assets and common equipment." Accepting Plaintiffs' own definition of capital costs, the only reasonable reading of Article 9(b) includes a requirement to pay those capital costs. However, Article 9(b) qualifies its requirement by stating that the expenses must be "authorized in accordance

by the By-Laws or a resolution adopted by a majority vote of the preferred shareholders." Contract at 9. The parties do not discuss whether the specific capital costs in dispute were properly authorized. Accordingly, genuine issues of material fact remain concerning the category of capital costs.

Article 10(b), which requires preferred shareholders to "pay any admission, special and/or maintenance fees established by the Board of Directors," id. at 9, is ambiguous. In particular, the word "special" is inherently unclear. Defendants contend that the Board could simply classify PDV's mortgage payments as a "special" fee and charge it to the preferred shareholders. Defs.' Mem. Law at 10. Even assuming that argument is true under one plausible reading of Article 10(b), Defendants have – again – not explained why it is the only plausible reading, particularly in light of the broad implications of their argument. Indeed, because "special" appears in the same list of fees as admission fees and maintenance fees,[17] it is reasonable to conclude that Article 10(b) does not give the Board a blank check to impose virtually

---

[17]     Elsewhere, for example, the Contract clarifies that there is an annual "established maintenance fee of [$]70.00 per share owned, per year," which is "to cover the costs of any general maintenance, alterations, additions, improvements of the ground and installations, minor repairs, and external paint of the apartment." Contract at 14. This fee is to "be deducted from net profits derived per the Rental pool agreement." Id.

any fee, no matter whether it is contemplated by the Contract, and label it "special." <u>See</u> Defs.' Mem. Law at 10-11 ("[I]t is PDV's position that preferred shareholders can be subject to a special assessment (i.e., a capital call) by a duly-approved resolution of PDV's Board of Directors without any limitation."). At the least, Defendants have failed to provide extrinsic evidence that illuminates the meaning of the word "special" in this context and justifies their position as the only reasonable one. Therefore, this Article remains ambiguous.

At a broad level, Article 13 is simply confusing, and may be the result of a drafting error. It begins: "For purposes of Article 10, the following are some of the common expenses." Contract at 10. It then goes on to list a number of different types of expenses. But Article 10 – which Article 13 is apparently intended to illuminate – makes no mention of "common expenses."[18] Accordingly, it is unclear what exactly Article 13 is meant to modify – and thus, what effect it has within the Contract.

---

[18]     Article 10 does contain the clause requiring preferred shareholders to "pay any admission, special and/or maintenance fees established by the Board of Directors." Contract at 9. It is conceivable that these fees might be the Article 13 "common expenses." But Defendant has not argued as much, or explained why that would be the only reasonable reading of these two articles – especially considering the fact that not all of the expenses listed in Article 13 would be set by the Board of Directors.

Finally, Section F of the PSCFS simply clarifies that "all operating expenses as described herein these contracts" are to be paid by deducting them from the rental pool income. Contract at 14. This section provides no additional clarity concerning which operating expenses are "described herein these contracts." If the Contract does not contemplate a particular operating expense, it appears – or at least, it is reasonable to conclude that – that expense is not relevant to Section F, and vice versa.

In short, the contract – by and large – remains ambiguous.[19] Accordingly, the Court may consider extrinsic evidence to resolve the ambiguity. Am. Eagle Outfitters, 584 F.3d at 588. Defendants have pointed to no such evidence and thus have given the Court no way to attempt to resolve the ambiguity.

To summarize, Defendants appear to concede that the plain language of the RPA does not support its interpretation. At best, then, for Defendants, either their interpretation is the only reasonable one – an argument that requires the demonstration of disputed facts – or the Contract is ambiguous. And because contractual ambiguities are also to be resolved by

---

[19]     The only exception is the question of capital costs, as discussed above, which must also survive summary judgment due to general issues of material fact.

triers of fact, the Court will deny the motion for summary judgment as to Plaintiffs' claims for breach of contract.

### B.   Piercing the Corporate Veil

As a general rule, members of a limited liability company or shareholders of corporations are "not personally liable to perform corporate obligations." Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1520-21 (3d Cir. 1994). But in some rare instances, courts will disregard that rule by "piercing the corporate veil," which is "an equitable remedy whereby a court disregards 'the existence of a corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.'" In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999) (quoting In re Schuster, 132 B.R. 604, 607 (Bankr. D. Minn. 1991)). A court should pierce the corporate veil only when "the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries." Kaplan, 19 F.3d at 1521 (alteration in original) (quoting Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc., 758 F. Supp. 1054, 1058 (W.D. Pa. 1990)).

The doctrine of piercing the corporate veil encompasses several different theories. Here, Plaintiffs apparently seek to pierce the corporate veil through the "alter

ego" theory,[20] which "is applicable where the individual or

---

[20]      Plaintiffs' intentions are not particularly clear; indeed, they actually conflate several meanings of "alter ego liability." In their complaints, they style this claim as "Alter Ego Liability/Piercing the Corporate Veil," and cite a case about piercing the corporate veil in support of their description of the alter ego theory. Lieberman Second Am. Compl. ¶ 203; Kreibich First Am. Compl. ¶ 152. It thus appears from the complaints that they intend to pierce the corporate veil under a theory of alter ego liability. But in their response to the motion for summary judgment – which itself confuses the issue as well – they assume that alter ego liability and piercing the corporate veil are two "separate[]" theories of liability. Pls.' Mem. Law at 27. Indeed, they even cite two different legal standards for alter ego liability and piercing the corporate veil. Id. at 21, 28.

However, the "alter ego liability" to which Plaintiffs refer and cite in that response is alter ego liability for the purposes of jurisdiction. That is, "a court may exercise personal jurisdiction, consistent with the Constitution, over a corporate entity that is the alter ego of a party over which jurisdiction is proper." Atl. Pier Assocs., LLC v. Boardakan Rest. Partners L.P., No. 08-4564, 2010 WL 3069607, at *3 (E.D. Pa. Aug. 2, 2010) (citing Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005)). As a result, courts have developed a number of factors that bear on whether entities are alter egos for the purposes of jurisdiction – and Plaintiffs cite to cases explaining these factors. See Renner v. Roundo AB, No. 08-209, 2010 WL 3906242, at *5 (W.D. Pa. Sept. 29, 2010); Atl. Pier Assocs., 2010 WL 3069607, at *3; Oeschle v. Pro-Tech Power, Inc., No. 03-6875, 2006 WL 680908, at *4 (E.D. Pa. Mar. 15, 2006); Gammino v. Verizon Commc'ns, Inc., No. 03-5579, 2005 WL 3560799, at *4 (E.D. Pa. Dec. 27, 2005); In re Latex Gloves Prods. Liab. Litig., No. MDL 1148, 2001 WL 964105, at *3-4 (E.D. Pa. Aug. 22, 2001). But what Plaintiff does not acknowledge is that these cases all specifically address the question of jurisdiction, and no more – this particular use for alter ego liability ends when jurisdiction is or is not found to exist.

Though Defendants challenged personal jurisdiction at the motion to dismiss stage, they are not challenging personal jurisdiction in their motion for summary judgment. Accordingly, the type of alter ego liability addressed by Plaintiffs is no

corporate owner controls the corporation to be pierced and the controlling owner is to be held liable." Miners, Inc. v. Alpine Equip. Corp., 722 A.2d 691, 695 (Pa. Super. Ct. 1998) (emphasis omitted). It is appropriate to pierce the corporate veil through this theory only where "a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefit in fraud of its creditors. In short, the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes." Kaplan, 19 F.3d at 1521.

In determining whether to pierce the corporate veil, courts are instructed to consider, among other things, whether: (1) the company is undercapitalized; (2) there has been a failure to observe corporate formalities; (3) the company is not paying dividends; (4) the dominant shareholder has siphoned funds from the company; (5) other officers or directors are not functioning; (6) there is an absence of corporate records; and (7) "the corporation is merely a facade for the operations of the dominant stockholder or stockholders." Id. (quoting United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981)).

Here, Plaintiffs allege that "Defendant Callan used

---

longer relevant. Rather, the relevant standard now is alter ego liability for the purposes of piercing the corporate veil.

co-Defendants PDV, Hawk Management, HWC, and HOF extensively and interchangeably in his fraudulent dealings with Plaintiffs." Pls.' Mem. Law at 21. Defendants, in their motion for summary judgment, argue that Plaintiffs have "presented scant evidence" in support of this claim, and thus that Defendants are entitled to judgment on the matter of piercing the corporate veil. Defs.' Mem. Law at 16.

Defendants are correct. Though Plaintiffs have put forth evidence showing that all Defendants were connected in various ways, they have not demonstrated that PDV is a "sham used to disguise" the misdeeds of Callan and/or the Hawk Defendants. Kaplan, 19 F.3d at 1521.

Plaintiffs point to four of the relevant factors. Pls.' Mem. Law at 28-30. First, they argue that PDV was undercapitalized, as evidenced by its failure to pay income distributions, as well as its need to take out a mortgage on the property and to receive advanced funding from HOF in order to complete construction of the hotel. But these facts are insufficient to support veil-piercing: PDV's failure to pay income distributions is evidence not of undercapitalization, but of underperformance, and it is patently absurd to suggest that the need to borrow money – especially at the beginning of a project – proves, on its own, that a company is undercapitalized. Indeed, that conclusion would, presumably,

33

expose nearly _every_ company to the possibility of veil-piercing. Moreover, Plaintiff has failed to present "any evidence . . . as to the level of capital required for a corporation of [PDV's] size to conduct" its business. Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 197 (3d Cir. 2003). Accordingly, the record contains no basis upon which a reasonable finder of fact could conclude that PDV's initial capitalization was not "sufficient for that corporate undertaking under normal operating conditions." Id.

Second, Plaintiffs argue that PDV failed to observe corporate formalities, as evidenced by:

> a) Callan's attempts to place investors into PDV and HOF as an investment vehicle; b) the significant overlap in ownership among PDV, HOF, HWC, and Hawk Management; c) the entities['] operation out of the exact same address; d) the instructions of PDV for investors to send their funds to HOF; e) PDV's instructions to return subscription forms for PDV to Hawk Management; f) the dominant control exerted by HOF over PDV; g) Hawk Management's role as general partner of and sole investment adviser to HOF with exclusive discretion to manage and invest its assets; and h) HWC's role as general partner of Hawk Management and ownership thereof along with its only two limited partners, Callan and [Scott] Williams.

Pls.' Mem. Law at 28-29. These assertions are, by and large, entirely irrelevant to the question of whether PDV observed corporate formalities. Rather, they form the basis of a general argument that the entities (and Callan) were impermissibly intertwined. Plaintiffs do not attempt to refute Defendants'

34

contentions that PDV adhered to "formalities such as conducting
board and shareholder meetings, maintaining insurance, filing
tax returns, electing officers, titling assets in the corporate
name, keeping books and records, and producing audited financial
statements." Defs.' Mem. Law at 19.

Third, Plaintiffs argue that there "is significant
evidence of intermingling of funds among the entities." Pls.'
Mem. Law at 29. Apparently, Plaintiffs intend this allegation to
relate to Pennsylvania's rule that "substantial intermingling of
corporate and personal affairs" may, in part, justify piercing
the corporate veil. Lumax Indus., Inc. v. Aultman, 669 A.2d 893,
895 (Pa. 1995) (quoting Kaites v. Dept. of Envtl. Res., 529 A.2d
1148, 1151 (Pa. Commw. Ct. 1987)). In support of this claim,
Plaintiffs cite to several transfers of money between PDV and
HOF.[21] Pls.' Mem. Law at 29. Plaintiffs do not explain how these
transfers rise to the level of "substantial intermingling of
corporate and personal affairs." To the contrary, the fact that
these transfers were memorialized in the companies' records,
rather than undocumented, "undercuts an alter ego theory." Wen
v. Willis, No. 15-1328, 2015 WL 6379536, at *6 (E.D. Pa. Oct.

---

[21]     Plaintiffs also reference a number of transfers
between HOF and HWC, and between HOF and Callan, but do not
explain how those transfers, which did not involve PDV, are
relevant when the question is whether to pierce PDV's corporate
veil.

35

22, 2015).

Fourth, Plaintiffs contend that "PDV was clearly used by Callan and the other Defendants to perpetuate a fraud." Pls.' Mem. Law at 29. Specifically, they say, "[t]here is substantial evidence to support a finding that the co-Defendants defrauded Plaintiffs into converting their preferred shares into worthless common shares. There is also ample evidence to support a finding that PDV's co-Defendants actively worked to deny Plaintiffs their rightful distributions under the rental pool agreements." Id. at 29-30. Plaintiffs do not cite to any of this evidence – or, in fact, to anything at all, in support of this argument. Broad assertions without any specific evidence whatsoever are insufficient to support a claim at summary judgment. See Anderson, 477 U.S. at 249 ("[I]n the face of [a] defendant's properly supported motion for summary judgment, the plaintiff [cannot] rest on his allegations . . . to get to a jury without 'any significant probative evidence tending to support the complaint.'" (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968))).

Finally, Plaintiffs also generally contend that Callan, PDV, and the relevant Hawk entities have a fatal "degree of commonality of ownership and function." Pls.' Mem. Law at 22. Plaintiffs point specifically to the facts that HOF owns a majority of outstanding PDV common stock, and that Callan is

36

PDV's President and Director while also a principal of HOF, owner of Hawk Management, and member of HWC. Id. But these relationships do not justify piercing the corporate veil. "Control through the ownership of shares does not fuse the corporations, even when the directors are common to each." United States v. Bestfoods, 524 U.S. 51, 69 (1998) (quoting Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2d Cir. 1929)). Moreover, even where "dual officers and directors ma[k]e policy decisions and supervise[] activities" at the other company, liability does not exist unless a party can present facts showing that, "despite the general presumption to the contrary, the officers and directors were acting in their capacities as" officers and directors for the wrong company "when they committed those acts." Id. at 69-70. If no such evidence exists, the "general presumption" holds: "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." Id. at 69 (quoting Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 779 (5th Cir. 1997)). Plaintiffs repeatedly suggest that common ownership itself is evidence of PDV's corporate unity with the Hawk Defendants. It is not.

Plaintiffs do provide a few instances that, Plaintiffs believe, demonstrate that PDV was, in effect, a single entity

with the Hawk Defendants. For example, a portion of the Kreibichs' investment in PDV was paid to HOF, and Callan suggested that the Kreibichs could "participate in [the Resort]" by investing in HOF. Pls.' Mem. Law at 23; Kreibich First Am. Compl. Ex. H at 35, Kreibich ECF No. 9-1. Even viewing these and other facts in the light most favorable to Plaintiffs, they do not present "specific, unusual circumstances" that overcome the strong presumption against piercing the corporate veil. Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 353 (3d Cir. 2001); see also Sugartown Worldwide LLC v. Shanks, No. 14-5063, 2015 WL 1312572, at *10 (E.D. Pa. Mar. 24, 2015) (noting that even "[s]elf-dealing, fraudulent transfers and fiduciary misconduct do not alone 'abuse the corporate form'").

        To summarize, Plaintiffs have failed to offer evidence from which a reasonable jury could conclude that PDV and Defendants, "in all aspects of the[ir] businesses, . . . actually functioned as a single entity and should be treated as such." Pearson v. Component Tech. Corp., 247 F.3d 471, 485 (3d Cir. 2001). Nor have they demonstrated that PDV might be merely "an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries." Kaplan, 19 F.3d at 1521 (alteration in original) (quoting Wheeling-Pittsburgh Steel Corp., 758 F. Supp. at 1058).

Accordingly, the Court will grant judgment to Defendants on Plaintiffs' claims of piercing the corporate veil.

    C.   <u>Fraud</u>

Next, Defendants argue that they are entitled to summary judgment on the Kreibichs' fraud claims. Two fraud-based counts remain: Count 5 (fraud/misrepresentation) and Count 8 (fraud in the inducement). In both claims, the Kreibichs allege that Defendants committed fraud in their efforts to convince the Kreibichs to convert their preferred shares to common stock. Defendants argue that (1) these claims are barred by the statute of limitations and (2) Defendants did not, as a matter of law, commit fraud.

The parties agree that a two-year statute of limitations applies to these claims. Defs.' Mem. Law at 24; Pls.' Mem. Law at 31. Defendants argue that the time period began to run no later than July 2011, when the conversion of the stock was completed. Defs.' Mem. Law at 24. If Defendants are correct, Plaintiffs' claims – filed in September 2014 – were more than a year too late. Plaintiffs, on the other hand, assert the discovery rule again: they argue that the two-year period did not begin to run until May 2014, when they learned in a phone call with Callan what their PDV shares were then worth. Pls.' Mem. Law at 31.

Again, the discovery rule "tolls the accrual of the statute of limitations when a plaintiff is unable, 'despite the exercise of due diligence, to know of the injury or its cause.'" Mest, 449 F.3d at 510 (quoting Pocono Int'l Raceway, Inc., 468 A.2d at 471). The rule "focuses not on 'the plaintiff's actual knowledge, but rather on whether the knowledge was known, or through the exercise of diligence, knowable to' the plaintiff." Mest, 449 F.3d at 511 (quoting Bohus, 950 F.2d at 925). In order to demonstrate that he exercised such "reasonable diligence," a plaintiff must show "that he pursued the cause of his injury with those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." Id. (quoting Cochran, 666 A.2d at 249).

As with Plaintiffs' breach of contract claims, the question whether the Kreibichs exercised reasonable diligence in discovering their alleged injuries is a question properly reserved for the jury. See id. at 512. Accordingly, the statute of limitations does not provide a basis for entering judgment on the Kreibichs' fraud claims at this time.

Defendants also briefly argue that they are entitled to judgment on the fraud claims because, in the Preferred Shareholders Letter at issue, "there was no representations [sic] made falsely, with knowledge of its falsity or

40

recklessness as to whether it is true or false or made with the
intent of misleading another into relying on it." Defs.' Mem.
Law at 25. Curiously, Defendants raise this argument in only
five sentences, one of which is a citation. They do not even set
forth the legal standards governing fraud/misrepresentation or
fraud in the inducement. Nor do they undergo any meaningful
analysis of the issues at stake, including the specific portions
of the Letter that Plaintiffs claim were fraudulent.
Accordingly, the Court will deny Defendants' motion for summary
judgment as to the Kreibichs' claims of fraud.

    D.    Tortious Interference

        Finally, Defendants argue that they are entitled to
summary judgment on Plaintiffs' tortious interference claims
against Callan and the Hawk Defendants. In those claims,
Plaintiffs allege that Callan and the Hawk Defendants caused
"PDV to withhold contractually obligated net income
distributions from preferred shareholders." Kreibich First Am.
Compl. ¶ 214. Lieberman further contends that these Defendants
deprived him of his use and enjoyment in his Unit, Lieberman
Second Am. Compl. ¶ 267, and the Kreibichs further claim that
these Defendants interfered with the Contract by convincing the
Kreibichs to convert their stock, Kreibich First Am. Compl.
¶ 215.

In order to prove tortious interference under Pennsylvania law, Plaintiffs must establish:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 384 (3d Cir. 2004) (quoting Crivelli v. Gen. Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000)). Defendants contend that Plaintiffs have not presented evidence of the second element – that is, that they have not demonstrated a purposeful action on the part of Callan and/or the Hawk Defendants. Indeed, Defendants say, Plaintiffs offer no relevant facts, but make only "conclusory statements that [Defendants] are all alter egos of each other." Defs.' Mem. Law at 25-26.

In response, Plaintiffs offer only two allegedly relevant facts (both of which relate only to the Kreibichs, not to Lieberman). First, they say that Callan "purposefully induced [the Kreibichs] to convert their preferred shares of PDV into common shares so as to deprive them of their distribution rights from the rental pool, as well as to deprive them of rights to their Unit." Pls.' Mem. Law at 34. But, as discussed above, the law presumes that Callan was acting on behalf of PDV, not

himself or the Hawk Defendants, when he took those actions. <u>See</u>
<u>Bestfoods</u>, 524 U.S. at 67-70. Plaintiffs have not offered any
evidence that overcomes that presumption. Second, Plaintiffs say
that Callan "repeatedly, albeit unsuccessfully, attempted to
have Plaintiffs convert their PDV common shares into shares of
Defendant HOF." Pls.' Mem. Law at 34. But Plaintiffs do not
explain how, if Callan's efforts were unsuccessful, they
suffered "actual legal damage" as a result of these particular
actions. <u>CGB Occupational Therapy</u>, 357 F.3d at 384.

Defendants correctly identify that Plaintiffs have
offered no specific facts demonstrating action with the intent
to interfere on the part of Callan or any of the Hawk
Defendants.[22] Accordingly, no reasonable jury could find, on the
evidence presented, that Callan and/or the Hawk Defendants
committed tortious interference here. The Court will therefore
grant judgment to Defendants on Plaintiffs' tortious
interference claims.

---

[22]    As an aside, this claim appears to conflict with
Plaintiffs' insistence that all of the Defendants are alter egos
of each other. That is, if Callan or the Hawk Defendants are
actually alter egos of PDV – and thus, one entity for legal
purposes – there presumably could be no "third party" here and
thus no possibility of tortious interference.

At any rate, because the Court is granting judgment as
to alter ego liability, the Court need not wade into this
particular thicket.

IV.   **MOTION TO APPOINT RECEIVER**

Plaintiffs – and non-party Richard Trout, who is currently suing PDV in the Bucks County Court of Common Pleas[23] – have also moved for the appointment of a receiver "to assess and monitor the finances" of PDV. Pls.' Mem. Law at 1, Lieberman ECF No. 45-2.

"The appointment of a receiver is an equitable remedy . . . available at the discretion of the court." Mintzer v. Arthur L. Wright & Co., 263 F.2d 823, 824 (3d Cir. 1959). There is no precise formula for determining whether a receiver should be appointed, but the parties agree that the Court should consider the following factors:

(1)   the probability of the plaintiff's success in the action;

(2)   the possibility of irreparable injury to the plaintiff's interests in the property;

(3)   the inadequacy of the security to satisfy the debt;

(4)   the probability that fraudulent conduct has occurred or will occur to frustrate the plaintiff's claim;

(5)   the financial position of the debtor;

(6)   the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;

(7)   the inadequacy of available legal remedies;

---

[23]   A motion for summary judgment is pending in that case.

44

(8)   the lack of a less drastic equitable remedy; and

(9)   the likelihood that appointing a receiver will do
      more harm than good.

Comerica Bank v. State Petroleum Distribs., Inc., No. 08-678,
2008 WL 2550553, at *4 (M.D. Pa. June 2, 2008).

　　　　Considered in sum, these factors weigh against
appointing a receiver.

　　　　Plaintiffs argue that the first factor – the
probability of their success – weighs in their favor because the
remaining claims survived Defendants' motions to dismiss. Pls.'
Mem. Law at 20-21. However, all that means is that they stated
claims upon which relief could be granted; surviving a motion to
dismiss does not necessarily mean that the claim is likely to
succeed. Indeed, if survival of a motion to dismiss was all that
was required to demonstrate a probability of success, this
factor would be virtually meaningless.

　　　　As to the second factor, Plaintiffs contend that their
interests in PDV may be irreparably injured because only a
receiver could "capture the full story" of PDV's finances. Id.
at 21-22. This argument is not responsive to the second factor,
however, because Plaintiffs have not explained how these alleged
injuries would be irreparable without a receiver.

　　　　The parties agree that the third factor – the adequacy
of the security – is irrelevant here. Id. at 22; Defs.' Mem. Law

at 10.

Regarding the fourth factor – the probability of
fraud – Plaintiffs say that "PDV has continuously and
systematically fraudulently withheld distribution payments to
preferred shareholders." Pls.' Mem. Law at 23. But that is the
basis of Plaintiffs' breach of contract claim, not a fraud
claim – Plaintiffs have not even brought claims of fraud with
respect to this conduct. And certainly, not all claims for
breach of contract involve fraudulent actions. Accordingly,
Plaintiffs have not shown that there is a probability of fraud.

The parties agree that the fifth factor – the
financial position of the debtor – is not relevant here. Id. at
24; Defs.' Mem. Law at 10.

The sixth factor is whether there is an imminent
danger of property being lost, concealed, injured, diminished in
value, or squandered. Plaintiffs argue that the financial and
accounting books and records of PDV may be in imminent danger
because PDV has previously failed to provide timely financial
statements. Pls.' Mem. Law at 24-25. But Plaintiffs do not claim
that any of the requested financial statements remain missing;
indeed, they managed to make detailed and specific
calculations – based on the financial statements – in responding
to the motion for summary judgment. Nor have Plaintiffs pointed
to any reasons to believe that Defendants are likely to destroy

46

documents, or that the money to which Plaintiffs believe they are entitled is likely to go missing.

As to the seventh factor – the inadequacy of available legal remedies – Plaintiffs argue that receivership is the sole adequate legal remedy because they seek a receiver for the limited purpose of reviewing PDV's financial information. Id. at 25. But Plaintiffs fail to explain why a receiver is even necessary, much less the sole legal remedy, when the damages they seek are already defined. That is, Plaintiffs have determined – based on PDV's financial statements – how much money to which they are entitled under their interpretation of the contract. It is not a mystery to be revealed at some future date through financial statements that remain missing. And, critically, if their interpretation of the contract is wrong – which is yet to be determined – they are not entitled to that money anyway.

The eighth factor is whether another equitable remedy is available to movants. As it seems there are no such remedies, this factor may weigh in favor of Plaintiffs. But, as discussed above, Plaintiffs have not persuasively explained why any equitable remedy is necessary in the first place.

Similarly, the ninth and final factor – whether a receiver would do more harm than good – also does not help Plaintiffs much. That is, they have not demonstrated that a

receiver would even do good in the first place, under the circumstances of this case.

Considering all of these factors, Plaintiffs have failed to show that they are entitled to the appointment of a financial receiver. Accordingly, the Court will deny this motion.

**V.    CONCLUSION**

For the foregoing reasons, the Court will: (1) deny Defendants' Motion for Judgment on the Pleadings; (2) grant Defendants' Motion for Summary Judgment as to Plaintiffs' claims of piercing the corporate veil and tortious interference with contract, but deny the remainder of the motion; and (3) deny Plaintiffs' Motion to Appoint a Receiver.